## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | CHAPTER 11 |
| | : | (Jointly Administered) |
| **KB TOYS, INC,** *et. al*[1] | : | |
| | : | Case  No. 04-10120 (KJC) |
| Debtors | : | Re: D.I. 6012 |

## MEMORANDUM[2]

## BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

KB Toys, Inc. and related entities (the "Debtors") filed voluntary petitions under chapter

11 of the United States Bankruptcy Code on January 14, 2004 (the "Petition Date").  Before the

Court is the Residual Trustee's (the "Trustee") Tenth Omnibus Substantive Objection to Claims

Pursuant to Sections 365(d), 502(b) and 502(d) of the Bankruptcy Code (D.I. 6012) (the "Claim

Objection"), in which, among other objections, the Trustee seeks disallowance of certain trade

claims.  Prior to the Claim Objection, the Trustee brought preference actions pursuant to

Bankruptcy Code §547 (the "Preference Actions") and obtained default judgments or summary

judgments against certain original holders of some trade claims (the "Original Holders").[3]

However, some of the Original Holders sold their trade claims (the "Sold Claims") post-petition

---

[1] Pursuant to an Order dated January 16, 2004, KB Toys, Inc.'s bankruptcy case was jointly administered with sixty-nine related debtors. All of the jointly administered cases, except KB Toys, Inc. and KB Toy of Massachusetts, Inc. (Bky. No. 04-10128), have been closed.  *See* Order Granting the Joint Motion of the Reorganized Debtors and the Residual Trustee to Close Certain Cases (D.I. 4393) dated February 23, 2006.

[2] This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and §157(a).  Venue is proper pursuant to 28 U.S.C. §1409. This adversary proceeding involves a core matter pursuant to 28 U.S.C. §157(b)(1) and (b)(2)(A), (B), (F), and (O).

[3] The "Original Holders" are listed in n.5, *infra*.

to ASM Capital, L.P. and ASM Capital II, LLP (together referred to as "ASM").  The Trustee

seeks to disallow these Sold Claims pursuant to Bankruptcy Code §502(d), although the

Preference Action judgments are against the Original Holders and the Sold Claims are now

owned by ASM.  For the reasons set forth below, the Trustee's Claim Objection to the Sold

Claims will be sustained.

Undisputed Facts

On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of

the Bankruptcy Code, then liquidated substantially all of their assets.  On August 18, 2005, this

Court entered an order (the "Confirmation Order")(D.I. 2981) confirming the Debtors' First

Amended Joint Plan of Reorganization Proposed by the Debtors and the Official Committee of

Unsecured Creditors Under Chapter 11 of the Bankruptcy Code (the "Plan")(D.I. 2554).[4]  The

Plan, which became effective on August 29, 2005, established the KBTI Trust, in accordance

with the Residual Trust Agreement, and the Trustee was appointed by the Residual Trust

Advisory Board. (*See* Confirmation Order at ¶L).  The KBTI Trust was authorized to liquidate,

collect and maximize the value of certain assets, as well as investigate and pursue avoidance

actions and other claims for the benefit of creditors.(*See* Plan, Article V).

On March 15, 2004, the debtors each filed a Statement of Financial Affairs

("SOFA")(*See* D.I. 473 - 501) pursuant to Code §521(a)(1)(B)(iii).  Question 3 of the SOFA asks

the debtor to identify all payments made within 90 days immediately proceeding the

commencement of the case (the "Preference Section").  The Preference Section in  the SOFA for

---

[4]The Plan was proposed by and effective as to all of the Debtors except BrainPlay.com, Inc. (Bky. No.
04-10131).

most of the related debtor entities states:

> All disbursements made to creditors for 90 days prior to the commencement of
> the Chapter 11 case were processed through the Debtors' consolidated and
> centrally maintained cash management system maintained by KB Toys of
> Massachusetts, Inc.  Therefore, these payments have been described and
> presented on the Statement of Financial Affairs of KB Toys of Massachusetts,
> Inc. (Case #04-10138 (JBR)).

(*See, e.g.*, D.I. 473).  Exhibit 3A attached to the SOFA for KB Toy of Massachusetts, Inc., also filed on March 15, 2004, contains a list of creditors who received potentially avoidable transfers during the preference period. (*See* D.I. 481).  All nine Original Holders of the Sold Claims are listed on Exhibit 3A.[5]

ASM purchased the Sold Claims from the Original Holders between April 7, 2004 and May 18, 2007.[6]  Pursuant to Rule 3001(e) of the Federal Rules of Bankruptcy Procedure, ASM filed notices of assignment for eight of the Sold Claims.  Four of the assignment agreements dated after May 3, 2004 contain indemnification clauses; five of the assignment agreements dated on or before May 3, 2004 do not.[7]

Between February 23, 2006 and May 16, 2008, the Trustee commenced adversary proceedings against the Original Holders.  Between June 2, 2006 and June 1, 2009, the Trustee

---

[5]The nine Original Holders listed in Exhibit 3A are: SPL Merchandising Inc. (Exhibit 3A, p. 760), Capitol Factors Inc. (c/o Accessory Times) (Exhibit 3A, p. 134), Natural Science Ind GPO (Exhibit 3A, p. 581), Liquidxs.com (Exhibit 3A, p. 500), HAS Sales & Marketing (Exhibit 3A, p. 394), Hubbard Security (Exhibit 3A, p. 410), Lee Middleton Original Dol (Exhibit 3A, p. 492), Haschel-Caribe Marketing & Distribution Co., Inc. (a/k/a Caribe Marketing & Sales) (Exhibit 3A, p. 135), Shaw Creations Inc. (Exhibit 3A, p. 737).

[6]ASM's contract does not indicate when ASM purchased the Accessory Times claim.  However, it appears that it was on or before August 4, 2005, when ASM filed the Rule 3001(e) Notice.

[7]Copies of the assignment agreements were attached as Exhibit A to the Trustee's Reply (D.I. 6057) and as Exhibit A to ASM's Memorandum of Law (D.I. 6084).

obtained default judgments or summary judgments against the Original Holders based on their

failure to answer or, having answered, failure to otherwise defend against the proceedings.  ASM

acquired eight of the Sold Claims before the Trustee commenced adversary proceedings.  ASM

acquired one of the Sold Claims (Liquidxs.com) after the Trustee had obtained a default

judgment against Liquidxs.com.  The transactions are illustrated in the chart that follows:

| Original Holder | Claim Amount | Date Bought | BR 3001 Notices | Summons Date | Judgment Date | Indemnification Clause |
|---|---|---|---|---|---|---|
| SPL Merchandising | $73,030.00 | 4/7/2004 | 4/7/2004 | 2/23/2006 | 6/16/2006 | No |
| Shaw Creations | $14,005.68 | 4/9/2004 | | 5/16/2008 | 6/23/2008 | No |
| Haschel-Caribe Marketing & Distribution | $128,817.85 | 4/26/2004 | 4/26/2004 | 6/22/2007 | 6/1/2009 | No |
| HAS Sales & Marketing | $118,813.48 | 4/29/2004 | 4/29/2004 | 2/23/2006 | 6/9/2006 | No |
| Hubbard Security | $2,340.50 | 5/3/2004 | 5/3/2004 | 6/14/2006 | 9/22/2006 | No |
| Natural Science Industries | $77,676.38 | 11/17/2004 | 11/17/2004 | 2/23/2006 | 6/6/2006 | Yes |
| Accessory Time Inc | $64,440.00 | 8/4/2005 | 8/4/2005 | 3/8/2006 | 6/2/2006 | Yes |
| Liquidxs.com | $163,092.60 | 1/16/2007 | 1/16/2007 | 2/23/2006 | 6/6/2006 | Yes |
| Lee Middleton Dolls | $30,151.85 | 5/18/2007 | 5/22/2007 | 2/20/2008 | 6/30/2008 | Yes |

On July 31, 2009, the Trustee filed the Claim Objection seeking disallowance of, among

other claims, the Sold Claims pursuant to Bankruptcy Code §502(d).  The face amount of the

Sold Claims exceeds $650,000.  ASM filed a response on August 28, 2009, arguing that the Sold

Claims are not subject to disallowance under Section 502(d) (D.I. 6023).  The Trustee replied to

ASM's Response on November 16, 2009, and ASM filed a Supplemental Response on

November 24, 2009.  On December 10, 2009, this Court held a hearing on the Claim Objection.

On February 8, 2010, ASM filed an additional Memorandum of Law in support of its position.

<u>Discussion</u>

The issue before the Court is whether the purchaser of a trade claim holds the purchased claim subject to the same rights and disabilities, and is subject to Bankruptcy Code §502(d) challenge, as is the original holder of the claim.

1.    <u>Section 502(d)</u>

When interpreting a section of the Bankruptcy Code, the rules of statutory construction require that "we begin by analyzing the statutory language, 'assuming that the ordinary meaning of that language accurately expresses the legislative purpose.' We must enforce plain and unambiguous statutory language according to its terms." *Hardt v. Reliance Standard Life Ins. Co.*, 130 S.Ct. 2149, 2156, 176 L.Ed.2d 998 (2010) (quoting *Gross v. FLB Fin. Serv., Inc.*, 557 U.S. 167, 129 S.Ct. 2343, 2350, 174 L.Ed.2d 119 (2009)); *Patel v. Attorney General of U.S.*, 599 F.3d 295, 298 (3d Cir. 2010).[8]  "[W]here the statutory language provides a clear answer, [the analysis] ends there as well." *Hughes Aircraft Co. v. Jackson*, 525 U.S. 432, 438, 119 S.Ct. 755, 760, 142 L.Ed.2d 881 (1999); *Daniel S. v. Scranton School Dist.*, 230 F.3d 90, 97 (3d Cir. 2000)(same).  We only look to the "legislative history if the statutory language is unclear." *Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984).

Bankruptcy Code §502(d) provides in relevant part:

Notwithstanding subsections (a) and (b) of this section, the court shall disallow *any claim of any entity* … that is a transferee of a transfer avoidable under section … 547 … of this title, unless such entity or transferee has paid the amount, or

---

[8]When interpreting the statutory provisions under dispute, we begin by looking at the terms of the provisions and the 'commonsense conception' of those terms." *Carachuri-Rosendo v. Holder*, 130 S.Ct. 2577, 2585, 177 L.Ed.2d 68 (2010)  ((quoting *Lopez v. Gonzales*, 549 U.S. 47, 53, 127 S.Ct. 625, 629, 166 L.Ed.2d 462 (2006)).

turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. §502(d) (emphasis added).  At issue is the meaning of the phrase "any claim of any

entity."  The Trustee argues that the statute says "claim," not "claimant;" and, therefore, §502(d)

should be interpreted to mean a disability accompanies the claim through its journey into the

hands of others.  ASM argues that "any claim of any entity" means only the "claimant," and,

consequently, the disability rests with the original claimant.

Differences of opinion exist about the "plain meaning" of §502(d). *Compare Enron*

*Corp. v. Avenue Special Situations Fund II, LP (In re Enron Corp.)*, 340 B.R. 180, 194

(Bankr.S.D.N.Y. 2006) ("*Enron I*") ("This statutory reference [§502(d)] is to *any claim*.")

(emphasis in original), and *In re Metiom, Inc.*, 301 B.R. 634, 642-43 (Bankr.S.D.N.Y. 2003)

("[T]he statute's plain meaning actually supports the Trustee's position. Section 502(d) disallows

the *claim* unless the entity that held the claim when it received an avoidable transfer pays the

amount for which it is liable.") (emphasis in original) with *Enron Corp. v. Springfield*

*Associates, LLC (In re Enron Corp.),* 379 B.R. 425, 443 (S.D.N.Y. 2007) ("*Enron II*") (vacating

and remanding the Bankruptcy Court's decision in *Enron I*) ("The plain language of section

502(d) focuses on the *claimant* as opposed to the *claim* [emphasis added]" and holding that

whether a disability travels with a transferred claim depends upon whether the transfer is a "sale"

(no disability) or an "assignment" (disability)).

2.     The Parties' Arguments

In the case before me, the Trustee makes three arguments in support of his Objection.

First, in accordance with *Enron II*, the Trustee argues that the claims transferred to ASM were

6

*assignments* and, therefore, the claims should be disallowed.  Second, the Trustee argues that KB Toys' Statement of Financial Affairs gave ASM constructive knowledge, if not actual knowledge, of the preferential transfers.  Such knowledge is evidence that ASM did not purchase the claims in good faith and, therefore, the claims should be disallowed.  Third, the Trustee questions *Enron II*'s analysis and its policy concerns.

ASM makes two primary arguments in defense of its claims.  First, in accordance with *Enron II*, ASM asserts that the claims at issue were transferred by "sales" and not "assignments." ASM argues that the parties' intent to "sell" the claims outweighs the fact that the documents used in the claim transfer were titled "Assignment Agreement" and referred to the parties as "assignor" and "assignee."  ASM also argues that "assignment" and "sale" are often used interchangeably in such claim transfer agreements, although claim transfer agreements are always "sales."

Second, again relying on the reasoning of the court in *Enron II*, ASM also argues that the plain language of §502(d) dictates focus on the claimant, not the claim.  ASM contends that disallowance is a personal disability of the claimant and, to the extent the Trustee has valid judgments against the Original Holders, the Trustee may preclude the Original Holders from participating in a distribution on account of any additional claims they may assert.  However, any personal disabilities are not transferred to, and cannot be asserted against, ASM.

I agree with the analysis and conclusions of the courts in *Metiom* and *Enron I*, discussed in more depth below: the plain language, legislative history, and decisional law support the view that a claim in the hands of a transferee has the same rights and disabilities as the claim had in the hands of the original claimant. Disabilities attach to and travel with the claim.

3.        Legislative History

In light of the debate over the clarity of the statutory language of §502(d), it is helpful to explore the origins of §502(d). The legislative history reveals that "subsection [502](d) is derived from present law." *Id.*   The "present law" from which §502(d) is derived is §57g of the Bankruptcy Act of 1898 (repealed 1978) (the "Bankruptcy Act"). *See In re America West Airlines, Inc.*, 217 F.3d 1161, 1168 (9th Cir. 2000) (stating "the predecessor to §502(d) [is] §57(g) of the Bankruptcy Act"); *Enron I,* 340 B.R. at 197-98 (quoting 4 Collier on Bankruptcy, ¶ 502.LH[7] at 99-100 (It is established that "[s]ection 502(d) is drawn from Section 57g of the 1898 Bankruptcy Act, … Section 57g did not deal with proof of claims but rather with their allowance, i.e. their right to share in the debtor's assets within the distributive scheme of the statute. Section 502(d) has the same focus.")).

Section 57g of the Bankruptcy Act provided:

> The claims of creditors who have received or acquired preferences, liens, conveyances, transfers, assignments or encumbrances, void or voidable under this title, shall not be allowed unless such creditors shall surrender such preferences, liens, conveyances, transfers, assignments, or encumbrances.

Vol A COLLIER ON BANKRUPTCY App. Pt. 3(a), Bankruptcy Act of 1898, Section 57g (11 U.S.C. §93) (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).   In other words, the claims of creditors who received avoidable transfers (preferential or otherwise) were not allowed until the transfers were surrendered to the estate. Section 57g established the basis for allowance or disallowance of particular *claims*.  This supports the interpretation of §57g's statutory successor similarly: disabilities travel with claims.  Section 502(d) "requires disallowance of a claim of a transferee of a voidable transfer in toto if the transferee has not paid the amount or turned over

the property received as required under the sections under which the transferee's liability arises."

HR Report No. 595, 95th Cong, 1st Sess 354 (1977); S Rep No. 989, 95th Cong, 2d Sess 65

(1978).

    4.    <u>Case Law</u>

    In 1902, the Eighth Circuit Court of Appeals considered application of section 57g of the

Bankruptcy Act to a claim objection, and decided that:

> The disqualification of a claim for allowance created by a preference inheres in and follows every part of the claim, whether retained by the original creditor or transferred to another, until the preference is surrendered.

*Swarts v. Siegel*, 117 F. 13, 15 (8th Cir. 1902). In that case, a bank held the debtor's promissory

note of $25,000, upon which a third party, F. Siegel & Bro. ("Siegel"), "had indorsed their

names before the notes were discounted for the purpose of giving [the debtors] credit, so that

they became accommodation makers thereon." *Id*. at 14. Within four months prior to the

debtor's bankruptcy filing, the debtor paid $14,600 to the bank on account of its obligation under

the note. *Id*. Siegel's indorsement allowed the bank to collect the balance due, including

interest, ($10,535.46), from Siegel. *Id*. Thus, Siegel stepped into the shoes of the bank and

became a creditor of the debtor's bankruptcy estate for $10,535.46 via subrogation. *Id*. at 15

(citing section 57i of the Bankruptcy Act). The Court wrote: "one who holds the rights or claims

of another by subrogation takes them subject to the limitations and disqualifications attached to

them in the hands of his predecessor." *Id*.

    Therefore, stepping into the shoes of the bank posed a problem for Siegel because the

bank had an unpaid preference judgment against it. *Id*. at 14 (stating "[t]he preference,

amounting to $14,600, which the court required the claimants to repay, is the same preference,

and results from the same payments, which the [bank] has been required to surrender as a condition of the allowance of its claim against the estate of this bankruptcy in Swarts v. Fourth Nat. Bank, 117 Fed. 1 [8th Cir. 1902]").  The issue before the *Swarts* Court was whether the bank's unpaid preference judgment followed the claim and blocked Siegel's right to recover payment from the estate on that claim.

The Eighth Circuit held that it did, stating "[t]he result is that the claim of F. Siegel & Bro. against the estate of the bankrupt cannot be lawfully allowed unless … the sum of $14,600 is paid back to the trustee either by the Fourth National Bank of St. Louis or by Siegel." *Id*. at 20. The Court noted that, as a surety, Siegel did not pay the bank voluntarily to relieve the bankrupt from liability, "but to buy the claim of the bank against [the debtor]."  *Id.* at 16.  The *Swarts* Court then wrote that "[Siegel's] only claim is for the amount the bankrupt owes upon the notes, and they take this claim subject to its disqualification in the hands of its former holder, the bank. It cannot be allowed until the preference . . . has been restored to the trustee."  *Id.*

Other circuit court decisions after *Swarts* applied the same reasoning.  In *Goldie v. Cox*, the Eighth Circuit held "[a]n assignee stands in the shoes of the assignor and subject to all equities against the assignor [and] [u]nless these claims . . . can be allowed to the claimant, the assignee would fare likewise." *Goldie v. Cox*, 130 F.2d 695, 720 (8th Cir. 1942) (citing *Fidelity Mut. Ins. Co. v. Clark*, 203 U.S. 64, 74, 27 S.Ct. 19, 51 L.Ed. 91 (1906)).   In *Dorr Pump & Mfg. Co.*, the Seventh Circuit held that stockholders, who made payments to wage earners in exchange for assignments of their rights against the estate, stood "in the shoes of the wage earners."  *Dorr Pump & Mfg. Co v. Heath et al. (In re Dorr Pump & Mfg. Co.)*, 125 F.2d 610, 611 (7th Cir. 1942).

10

Decisional law following the enactment of the Bankruptcy Code continued to interpret the rights of transferees as subject to the equities and burdens of the transferor.  Incorporation by Congress of the former disallowance provision into the Code is significant and, unless it can be inferred that Congress intended clearly to change a provision of the existing law (such as through an explicit change in the language of the statute or a statement in legislative history), prior case law interpreting the provision is still valid law.  *See Dewsnup v. Timm*, 502 U.S. 410, 419 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) ("When Congress amends the bankruptcy laws, it does not write 'on a clean slate.' *See Emil v. Hanley [(In re John M. Russell, Inc.)]*, 318 U.S. 515, 521, 63 S.Ct. 687, 690-691, 87 L.Ed. 954 (1943).  Furthermore, this Court has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history.").

Recent bankruptcy court decisions in the Southern District of New York have espoused a view consistent with pre-Code case law.  In *Metiom*, one of the issues before the Court was whether a claim may be disallowed in the hands of a transferee if the transferor received an avoidable transfer at the time it held the claim. *In re Metiom, Inc.*, 301 B.R. 634, 642-43 (Bankr. S.D.N.Y. 2003).  The Court held that:

> [S]ection 502(d) disallows the claim unless the entity that held the claim when it received an avoidable transfer pays the amount for which it is liable.  The claim and the defense to the claim under §502(d) cannot be altered by the claimant's subsequent assignment of the claim to another entity … that has not received an avoidable transfer. . . .  The assignment should not, and does not, affect the debtor's rights vis a vis the claim; it is incumbent, instead, on prospective assignees to take into account possible claim defenses when they negotiate the terms of their assignments.

*Id.* at 643.  The Court further noted that "[t]he case most directly on point stated the rule over a

century ago" and cited to *Swarts*.  *Id.*  The *Metiom* Court also decided:

> This reading of section 502(d) conforms with the established rule that the
> assignee of a non-negotiable instrument is subject to all of the equities and
> burdens that attach to the property assigned, because the assignee receives no
> more than the assignor possessed.

*Id.*

In *Enron I*, the Bankruptcy Court held that "bank-loan claims, which were transferred by

the original holder of the claims, who is alleged to have received avoidable transfers, [are

subject] to disallowance under §502(d) of the Bankruptcy Code in the hands of a transferee."

*Enron I*, 340 B.R. at 210.  In that case, the debtor brought preference and fraudulent conveyance

actions against Fleet National Bank ("Fleet") and other lenders.  *Id.* at 184-85.  After the

bankruptcy filing, but prior to commencement of the avoidance actions, Fleet transferred the

claims to other entities.  *Id.*  The debtor filed an adversary complaint against the claim

purchasers under Bankruptcy Code §502(d) to disallow the transferred claims. *Id.*  The claim

purchasers moved to dismiss the complaint, arguing that the language of §502(d) did not apply to

them because (among other things) "the purpose of §502(d) is not to punish, but to coerce the

holder of the claim, which itself holds a voidable transfer, to comply with judicial orders

requiring it to return the avoidable transfer."*Id.* at 189.  Therefore, they argued, §502(d) applies

only to the party who received the avoidable transfer because *that party* can decide whether "to

return the smaller amount of the avoidable transfer to the debtor in exchange for allowance of

their larger claims."[9]  *Id.*

---

[9]The claim purchasers in *Enron* also argued that §502(d) did not apply to them because the avoidance
action against Fleet was still pending. They argued that the plain language of §502(d) intended to

The *Enron I* Court reviewed carefully the language and legislative history of §502(d), as well as existing case law, and concluded:

> [T]he transfer of a claim subject to a section 502(d) disallowance in the hands of the transferor remains subject to disallowance in the hands of transferee. . . . The claim and the section 502(d) disallowance defense are linked, and such relationship is not severed by a transfer.

*Id*. at 183-84. Agreeing with the *Metiom* Court, the *Enron I* Court decided that §502(d) is, in essence, an affirmative defense to a claim and an affirmative defense is not destroyed by a transfer of the claim. *Id.* at 198. The Court further noted that the Federal Rules of Bankruptcy Procedure supported this result:

> [T]here is no basis to find or infer that a transferee should enjoy greater rights than the transferor. On the contrary, Bankruptcy Rule 3001(e)(2) regarding the "transfer of claim" states that ". . .the transferee shall be *substituted* for the transferor. [Fed.R.Bankr.P.] §3001(e)(2) (emphasis added). "Substitute" means "one who stands in another's place." BLACK'S LAW DICTIONARY 1470 (8th ed. 2004). To "substitute" means . . . "to put or use in place of another." AMERICAN HERITAGE COLLEGE DICTIONARY 1377 (4th ed. 2002). Bankruptcy Rule 3001(e) supports that a transferee cannot assert greater rights than the original transferor.

*Id.* at 198-99. The *Enron I* Court noted additionally that case law "affirmed the principle that a claim transfer does not change the nature of the claim in bankruptcy; rather it creates a substitution of parties." *Id.* (citing *Carnegia v. Georgia Higher Educ. Assistance Corp.*, 691 F.2d 482, 483 (11th Cir. 1982)).

---

disallow a claim only *after* a judgment is entered requiring the entity to the return property under other sections of the Bankruptcy Code and that entity has failed to return the property. *Id.* at 186. The Court held that "a cause of action based on section 502(d) should not be dismissed even though the court has not yet adjudicated an avoidance action concerning the unrelated transactions because a debtor may, in the form of either an objection to a proof of claim or commencement of an adversary proceeding, use section 502(d) as a defense to the assertion of a claim." *Id*. at 183. *But see Guiliano v. Mitsubishi Digital Electronics America, Inc. (In re Ultimate Acquisition Partners, LP)*, Adv. No. 11-52663, slip op. at 5-8 (Bankr.D.Del. May 1, 2012) (dismissing a §502(d) claim in the absence of judicial determination of liability for the preferential transfer).

Moreover, the *Enron I* Court considered the policy arguments advanced by both parties before it. The debtor argued that one of the consequences of shielding transferred claims from disallowance under §502(d) would be to encourage creditors to "wash" the claims free of any possibility of disallowance simply by transferring them. The claim purchasers argued that the debtor retained the ability to pursue the previous claim holder for recovery of the avoidable transfer. The Court wrote:

> The policy underlying section 502(d) is that creditors who received avoidable transfers are not allowed to participate in a distribution from the debtor's estate and not entitled to make additional demands on the assets of the estate unless and until they turn over avoidable transfers to the estate. . . .
> [A]llowing a transferred claim in the hands of the transferees from the transferors who received avoidable transfers and did not pay or turn over the avoidable transfer would seriously undercut the purpose and policy of section 502(d). . . .It would permit participants in the distribution process, where such is unwarranted until the underlying avoidance action is resolved and any payment to the estate, if due, is made.

*Id.* at 201. The *Enron I* Court also considered the claim purchasers' contention that "a judicial determination that the claims should be disallowed would seriously and needlessly undermine confidence in the system of post-petition transfers of claims and impact the liquidity of the market for post-petition transfers of claims." *Id.* at 202. The Court noted:

> [P]articipants in the claims-transfer market are aware of, or should be aware of, the risks and uncertainties inherent in the purchase of claims against the debtors, including the possibility of claims being temporarily disallowed under section 502(d) unless and until their predecessors turn over the avoidance transfers. . . . The purchase of a claim, itself, evidences the transferee's willingness to assume the risks attendant to a bankruptcy proceeding.

*Id.*

In *Enron II,* the district court vacated and remanded the bankruptcy court's decision in *Enron I. Enron II*, 379 B.R. at 428. The *Enron II* Court found that "[t]he plain language of

14

section 502(d) focuses on the claimant as opposed to the claim and leads to the inexorable

conclusion that disallowance is a personal disability of a claimant, not an attribute of the claim."

*Id.* at 443.

The *Enron II* Court also determined that one of the main purposes of section 502(d),

namely to coerce the return of assets obtained by preferential transfer, "would not be served if a

claim in the hands of a claimant could be disallowed even where that claimant never received the

preference to begin with, and as a result, could not be coerced to return it."  *Id.* at 443.  The

Court further wrote:

> [S]ection 502(d) was not intended to punish, but rather 'to give *creditors* an
> option to keep *their* transfers (and hope for no action by the trustee) or to
> surrender *their* transfers and *their* advantages and share equally with other
> creditors. Applying section 502(d) to purchasers of claims would be punitive
> because they have no option to surrender something they do not have, which
> means they have not personally obtained any advantage that they could surrender.

*Id.* at 443-444 (emphasis in original).   The *Enron II* Court decided that the *Enron I* Court and

the *Metiom* Court should have distinguished between an claim *purchaser* and a claim *assignee*.

*Id.* at 445 (emphasis added).  The *Enron II* Court noted that sales and assignments can have very

different consequences for the transferee:

> [A]n assignee of a claim takes with it whatever limitations it had in the hands of
> the assignor.  These principles are a corollary to the well-established doctrine of
> *nemo dat qui non habet:* an assignor cannot give more than he has.  By contrast,
> these assignment law principles do not apply to sales.  A purchaser does not stand
> in the shoes of the seller and, as a result, can obtain more than the transferor had
> in certain circumstances. [citing, for example, N.Y. U.C.C. §8-202(d) (stating that
> all defenses of the issuer of a security with enumerated exceptions, are
> "ineffective against a purchaser for value who has taken the security without
> notice of the particular defense." (emphasis added)).]

*Id*. at 435-36 (including n. 58, other footnotes omitted).   Therefore, "[a] personal disability that

has attached to a creditor who transfers its claim will travel to the transferee if the claim is *assigned*, but will not travel to the transferee if the claim is *sold*." *Id.* at 436 (emphasis in original). The *Enron II* Court remanded the case to the Bankruptcy Court to determine whether the transfers were assignments or sales.[10]

The terms "assignment" and "sale" are not easily distinguishable. The Bankruptcy Code does not define "sale" or "assignment," although the Code definition of "transfer" arguably includes both.[11] In this context, use of any distinction between the two terms has been widely criticized.[12] According to the *Enron II* Court, how the parties characterize the transfer in the

---

[10] The *Enron II* Court considered the issue of whether disabilities follow the *claim* or the *claimant* with respect to both §502(d) disallowance and §510(c) equitable subordination. *Enron II*, 379 B.R. at 427-28.

[11] 11 U.S.C. §101(54)(D) ("The term 'transfer' means … (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an interest in property.") According to Black's Law Dictionary, a "sale" is "the transfer of property or title for a price" (citing Uniform Commercial Code § 2-106(1)), while an "assignment" is "a transfer of rights or property." BLACK'S LAW DICTIONARY (9th ed. 2009) Therefore, a "transfer" of property can be either an assignment or a sale.

[12] *See, e.g.,* Adam J. Levitin, *Bankruptcy Markets: Making Sense of Claims Trading*, 4 BROOK. J. CORP. FIN. & COM. L. 67, 92 (2009) ("The district court held that the answer depended on whether the claim was 'sold' or 'assigned,' a novel distinction that flew against the long-standing interchangeability of these terms in legal practice."); Jennifer W. Crastz, *Can a Claims Purchaser Receive Better Rights (Or Worse Rights) Than Its Transferor in a Bankruptcy?*, 29 CAL. BANKR. J. 365, 373 (2007) ("While the [*Enron II*] court went a long way to support the claims trading industry in terms of shielding buyers from liability for creditor misconduct, the district court created a new conundrum for the claims trading industry by turning its decision on the sale versus assignment analysis – terms that the financial world has always used interchangeably."); Tally M. Weiner & Nicholas B. Malito, *On the Nature of the Transferred Bankruptcy Claim*, 12 U. PA. J. BUS. L. 35, 49 (2009) ("The District Court's [*Enron II*] ruling is unusual . . . [because] it draws a distinction between the consequences of transferring a claim through a sale, as opposed to an assignment, that neither the parties that appealed to the District Court nor the amici curiae thought carried any significance."); Roger G. Jones & William L. Norton, III, NORTON CREDITORS' RIGHTS HANDBOOK § 8:8 *Theories on Lender Liability – Equitable Subordination* (2008) ("The [*Enron II* Court] recently held that equitable subordination will be effective against a transferee when received by pure assignment . . . but will generally be ineffective against a purchaser who takes by way of a sale. The court never explains the difference . . . and the case law does not bear out the distinction."); Kevin M. Lippman & Jay H. Ong, *Claims Trading: New York District Gets Bullish on Bankruptcy Claims Market,*, MUNSCH HARDT KOPF & HARR PC, Jan. 18, 2008, www.munsch.com/newsstand/articles-82 ("The District Court's holding is

transfer document is not relevant for purposes of a §502(d) analysis; rather, the legal effect of the document's provisions will determine whether a transfer is a "sale" or an "assignment."  *Enron II*, 379 B.R. at 435 (stating the distinction "depend[s], not on the name by which it calls itself, but on the legal effect of its provisions.").  Even if, for this purpose, there exists a clear and principled way to distinguish between an assignment and a sale, the exercise, in this context, is unhelpful and unrevealing of the appropriate outcome.

The *Enron II* Court opined that burdening the transferee of a claim with a disability imposed on a claim by the transferor would upset the distressed debt markets.  *Enron II*, 379 B.R. at 448 (stating "[t]he unnecessary breadth of the Bankruptcy Court's decisions threatened to wreak havoc on the markets for distressed debt.").

Claims trading markets are as old as our nation.  *See* Chaim J. Fortgang & Thomas M. Mayer, *Trading Claims and Taking Control of Corporations in Chapter 11*, 12 CARDOZO L. REV. 1, 25-27 (Oct. 1990) (discussing the purchase of Continentals (*i.e.,* debt securities issued by the states during the Revolutionary War to pay the colonies' soldiers and the farmers and merchants who supplied them) by early claims traders in anticipation of the federal government backing the states' debts).  Policy makers specifically contemplated and addressed the transfer of claims in the provisions in the 1898 Act, which were carried forward into the current Bankruptcy

---

fraught with uncertainty . . . First, prior to this ruling by the District Court, participants in the claims trading market did not clearly differentiate in claims transfer documents whether the transaction was a sale or an assignment. Practically speaking, the participants considered those terms synonymous. Thus, reviewing the transfer documents to determine the intent of the parties may not end the inquiry. Second, the District Court failed to provide any clear guidance as to what constitutes a sale or an assignment.").

Code, and the Federal Rules of Bankruptcy Procedure.[13]

There is no question that the distressed claims trading market has grown in size and scope.  *See* Adam J. Levitin, *Bankruptcy Markets: Making Sense of Claims Trading*, 4 BROOKLYN J. CORP., FIN. & COMM. L. 67 (2009); Michelle M. Harner, *Trends in Distressed Debt Investing: An Empirical Study of Investors' Objectives*, 16 AM. BANKR. INST. L. REV. 69 (2008). Distressed debt trading has become so commonplace that it plays a part in nearly every major chapter 11 case.  Buyers of debt, in the Court's experience, are highly sophisticated entities fully capable of performing due diligence before any acquisition.  However, even without *any* due diligence, today's claim purchasers are aware of the ever-present possibility of avoidance actions based on preference liability or fraudulent conveyances.  Under the circumstances now before me, the assertion that subjecting transferred claims to §502(d) disallowance would cause disruption in the claims trading market is a hobgobin without a house to haunt.[14]

5.      Analysis

---

[13]*See* Fortgang, *supra.* 12 CARDOZO L. REV. at 19-20 ("When the Supreme Court in 1898 adopted the original General Orders in Bankruptcy – the precursors to today's Rules of Bankruptcy Procedure – General Order XXI(3) governed the assignment of claims … General Order Order XXI(3) was converted to arabic numerals in 1939, but otherwise remained unchanged for seventy-seven years.  In 1975, the Supreme Court restated General Order 21(3) without material changes in Bankruptcy Rules 302(d)(1) and (2), and 10-401(c).").

[14]The claims before me in this matter are trade claims purchased from the original holders of such claims. I make no determination about whether the same result should ensue in circumstances involving other types of transferred claims.  It seems that the drafters of the Bankruptcy Rules also recognized when public markets might be affected. For example, publicly traded note, bond and debenture claims are excluded from the disclosure requirements of Fed.R.Bankr.P. 3001(e), presumably to facilitate trading of public securities.  *See* 9 COLLIER ON BANKRUPTCY ¶3001.08 [1]  (Alan N. Resnick & Henry J. Sommer eds., 16th ed.)

In the matter before me, the Debtors filed a SOFA listing potential preference defendants prior to any of the transactions between ASM and the Original Holders. Thus, the Debtor's SOFA placed ASM and all other potential buyers of trade claims on constructive notice, if not actual notice, of potential preference actions against the original claim holders and the potential for disallowance of the claims under §502(d).  ASM could have discovered the potential for disallowance with very little due diligence and factored the potential for disallowance into the price it paid for the trade claims.[15]

Indeed, in several claim purchases, ASM did protect itself by including indemnity clauses in the transfer agreements requiring an immediate restitution payment if a transferred claim is disallowed.  Historically, indemnity provisions have been important terms in claims trading agreements.[16]  The fact that ASM used indemnity clauses in four of the contracts indicates that ASM had sufficient understanding and leverage to negotiate for such provisions.  In circumstances in which ASM did not contract for specific indemnity clauses, ASM may have other remedies or chose to bear the risk.[17]  To require the estate to pay claims in these instances

---

[15]Indeed, one of the Sold Claims (Liquidxs.com) was acquired even *after* the Trustee had obtained a default judgment against the Original Holder.

[16]*See* Fortgang, *supra.*, 12 CARDOZO L. REV. at 19 ("The importance of such representations, warranties and indemnities should not be underestimated.")

[17]The court in *Enron I* noted that there may be transfers of claims that cannot be reasonably protected by indemnification, but:

> whether the purchaser of a claim protects itself is not an issue with which a bankruptcy court need to be involved.  The concern of the Bankruptcy Code is the distribution on a claim.  Whether that claim results from a bank loan, a bond, or any other types of debtor-creditor relationship, it is still a claim - - characteristics of which are not altered by the transfer.  A transferee does not obtain greater rights from the claim than the transferor.  Whether or not a transferee enters into a negotiation process of contracting with a transferor to protect its interest is a matter of choice for such transferee and does not limit

would make the estate the claim purchaser's insurer.  If a claim purchaser is able to evade a

§502(d) challenge, the estate would be providing the claim purchaser and the seller with a

benefit for which neither paid.

Finally, ASM also argues that their claims should not be disallowed because they

purchased their claims in "good faith." The claim purchasers in *Enron I* also argued that

"because 502(d) refers to 550(b) of the Bankruptcy Code, the rights of a good faith purchaser,

including a claim purchaser, are protected in section 502(d)." *Id.* at 189. The *Enron I* Court

rejected this argument, noting that "courts have found that a transferee is not a good faith

transferee if he knows of a debtor's financial difficulties and the likelihood of bankruptcy." *Id.*

at 207.  The Court decided:

> [T]he criteria for determining whether a transferee acted in good faith in the
> purchase of claims does not solely rely upon such transferee's actual knowledge
> of whether the claims would be challenged. Instead, what is required under
> section 550(b) of the Bankruptcy Code is (1) the transferee's knowledge of the
> debtor's possible insolvency or unfavorable financial condition at the time of the
> transfer, or (2) notice that the transfer may be recovered by the trustee. . . . [A]
> purchaser of a claim, by definition, knows that it is purchasing a claim against a
> debtor and is on notice that any defense or right of the debtor may be asserted
> against that claim.

*Id.* at 207-08.   A claim purchaser knows that it is obtaining a claim against a debtor

whose unfavorable financial condition has caused it to seek the protections afforded by

the bankruptcy process.  A purchaser of claims in a bankruptcy is well aware (or should

be aware) that it is entering an arena in which claims are allowed and disallowed in

accordance with the provisions of the Bankruptcy Code and the decisional law

---

the debtor's right to assert a section 502(d) defense against a claim.
*Enron I*, 340 B.R. at 204.

interpreting those provisions. Under such conditions, a claims purchaser is not entitled to the protections of a good faith purchaser.

Conclusion

For the foregoing reasons, I conclude that a trade claim purchaser holds that claim subject to the same rights and disabilities under Bankruptcy Code §502(d) as does the original trade claimant.  The Trustee's Claim Objection will be sustained.

An appropriate order follows.


BY THE COURT:


_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE


Dated: May 4, 2012